1  William G. Royce
   LAW OFFICE OF WILLIAM G. ROYCE
2  310 K Street, Suite 200
   Anchorage, Alaska 99501
3  Telephone: (907) 495-1000
   roycelawoffice@gmail.com
4
   Kevin D. Neal (*Pro Hac Pending*)
5  GALLAGHER & KENNEDY, P.A.
   2575 East Camelback Road
6  Phoenix, Arizona 85016-9225
   Telephone: (602) 530-8000
7  Facsimile: (602) 530-8500
   kevin.neal@gknet.com
8
   Attorneys for Plaintiffs John E. Davis and
9  MaryLou Davis

10               **UNITED STATES DISTRICT COURT**

11              **FOR THE DISTRICT OF ALASKA**

12
   JOHN E. DAVIS and MARYLOU DAVIS,        No.
13 a married couple,
                                           **COMPLAINT**
14              Plaintiffs,

15 v.

16 BLUE AIRCRAFT, LLC, an Alaskan
   limited liability company; VENTURE
17 TRAVEL, L.L.C., an Alaskan limited
   liability company, d/b/a TAQUAN AIR;
18 MICHAEL J. HUDGINS; JOHN DOES 1-
   V; and ABC BUSINESS ENTITIES I-V,
19
                Defendants.
20

21        JOHN E. DAVIS ("Jack Davis") and MARYLOU DAVIS ("MaryLou Davis") a

22 married couple, by and through their attorneys William G. Royce and Kevin D. Neal, file

23 their Complaint for damages against Defendants BLUE AIRCRAFT, LLC ("Blue

24 Aircraft") an Alaskan limited liability company and VENTURE TRAVEL, L.L.C., an

25 Alaskan limited liability company, d/b/a TAQUAN AIR ("Taquan Air"); and MICHAEL

26 J. HUDGINS ("Hudgins").

Plaintiffs respectfully allege as follows:

**INTRODUCTION**

1. On the morning of July 10, 2018, Plaintiff Jack Davis, and nine other guests, were departing Steamboat Bay Fishing Club on Noyes Island, Alaska.

2. Steamboat Bay had arranged for this transportation to Ketchikan, Alaska through Taquan Air by seaplane.[1]

3. Jack Davis boarded a de Havilland DHC-3T Vazar Turbine Otter N3952B seaplane ("Seaplane") owned by Blue Aircraft and operated by Taquan and piloted by Taquan employee Mike Hudgins.

4. Despite marginal visual meteorological conditions, Hudgins decided to depart the dock at Steamboat Bay and taxi out across the waters of the Gulf of Esquibel for a departure to the Ketchikan Harbor Seaplane Base.

5. Even with worsening weather conditions and poor visibility, Hudgins and personnel at Taquan determined the Seaplane could take off from Steamboat Bay with 10 passengers on board.

6. After the Seaplane lifted off from Steamboat Bay, Hudgins flew low over the water as he headed in several different directions looking for areas of better visibility.

7. The meteorological conditions continued to worsen as did the visibility for this Visual Flight Rules (VFR) flight with Taquan and the pilot operating under the provisions of 14 Code of Federal Regulations (CFR) Part 135.

---

[1] The Unites States Coast Guard Inland and International Navigation Rules and Title 33: Navigation and Navigable Waters from Code of Federal Regulations as of April 2019 defines seaplanes as follows: (a) The word "vessel" includes every description of water craft, including non-displacement craft and seaplanes, used or capable of being used as a means of transportation on water; (e) The word "seaplane" includes any aircraft designed to maneuver on the water.

2

8.     While flying low over water Hudgins changed course several times to avoid areas of clouds and no visibility, but generally remaining low enough to see the water beneath him.

9.     Hudgins thought he was still flying over water when he flew the Seaplane into clouds.

10.    Hudgins thought he saw water again, but became disorientated then eventually determined he was looking at snow and rising terrain.

11.    Hudgins attempted a climbing turn but crashed the Seaplane into the side of Mount Jumbo on Prince Edward Island, Alaska.

12.    Jack Davis and other passengers were injured in the Taquan Seaplane crash.

13.    Everyone on board the Seaplane had to be rescued by the United States Coast Guard.

## PARTIES

14.    At all times relevant herein, Plaintiffs Jack Davis and Mary Lou Davis were and are residents of Scottsdale, Arizona and citizens of the State of Arizona.

15.    At all times relevant herein, Plaintiffs Jack Davis and Mary Lou Davis were and currently are married to each other.

16.    At all times relevant herein, Blue Aircraft, L.L.C. was an Alaskan limited liability company, with its principal place of business in Ketchikan, Alaska, and is citizen of the State of Alaska d/b/a Taquan Air.

17.    Upon information and belief, the sole Member of Blue Aircraft, LLC is Gerald O'Brien Salazar, a resident and citizen of the State of Alaska.

18.    At all times relevant herein, Venture Travel, L.L.C. was an Alaskan limited liability company, with its principal place of business in Ketchikan, Alaska, and citizen of the State of Alaska d/b/a Taquan Air.

3

1    19.    Upon information and belief, the sole Member of Venture Travel, LLC is

2    Gerald O'Brien Salazar, a resident and citizen of the State of Alaska.

3    20.    At all times relevant herein, Blue Aircraft and Taquan Air (hereinafter

4    collectively "Taquan") operated seaplanes from a seaplane base on the water adjacent to

5    Ketchikan, Alaska.

6    21.    Taquan conducts flightseeing, charters, freight and scheduled routes under

7    14 C.F.R. Part 135.

8    22.    At all times relevant herein, Michael Hudgins was a resident of Ketchikan,

9    Alaska and citizen of the State of Alaska.

10    23.    Taquan is vicariously liable for the acts/omissions of its employees,

11    representatives, contractors, and agents, including Michael Hudgins, under theories of

12    respondeat superior, agency, negligence, negligent entrustment, and negligent supervision.

13    24.    The term "Taquan" in this complaint means Taquan acting through its

14    employees, representatives, contractors and/or agents.

15    **Subject Matter Jurisdiction**

16    25.    This Court has diversity jurisdiction over Plaintiffs' claims under 28 U.S.C.

17    § 1332 because the amount in controversy exceeds seventy-five thousand dollars

18    ($75,000), and Plaintiffs are citizens of a different state than Defendants.

19    26.    In addition to, and in the alternative, this Court has subject matter

20    jurisdiction over Plaintiffs' claims under the maritime and admiralty jurisdiction of the

21    Court, pursuant to Article III, §2 of the United States Constitution, delegating jurisdiction

22    over admiralty cases to the federal courts, and 28 U.S.C. §1333.

23    27.    This incident involved a Taquan Seaplane carrying passengers, traveling

24    across navigable waters from a remote fishing camp on an island of the United States and

25    across the Pacific Coast, and around and through Alaska's coastal islands, in what was to

26    culminate in a water landing near Ketchikan, Alaska.

4

28.     The subject incident bears a significant relationship to maritime activity:

       a.     On July 10, 2018, Plaintiff, Jack Davis was a paying passenger on a Taquan Seaplane.

       b.     On July 10, 2018, the Taquan Seaplane pilot Hudgins made negligent decisions to cast off from Steamboat Bay dock with passengers on board with deteriorating weather and visibility conditions.

       c.     On July 10, 2018, the Taquan Seaplane pilot Hudgins made negligent decisions to take off from the navigable waters of Steamboat Bay with passengers on board with deteriorating weather and visibility conditions.

       d.     On July 10, 2018, the Taquan Seaplane pilot Hudgins made negligent decisions to continue flying into deteriorating weather and visibility conditions while over water and when a water landing was available.

       e.     Jack Davis was injured when the Taquan Seaplane pilot, who thought he was flying over water, impacted Mount Jumbo on Prince Edward Island, Alaska.

       f.     Seaplane pilots are expected to know and adhere to both the United States Coast Guard's (USCG) Navigation Rules, International-Inland, and 14 CFR Section 91.115, Right-of-Way Rules; Water Operations.

       g.     The only means of transportation between Noyes Island and Ketchikan is by boat or seaplane.

29.     It is a settled principle of maritime law that owners of vessels owe passengers the duty to exercise reasonable care under the circumstances.

30.     Accordingly, the legal rights and liabilities arising from the incident are subject to the General Maritime Law of the United States and within the full reach of the Court's admiralty jurisdiction.

5

**Venue**

2       31.    Venue is proper in the District of Alaska pursuant to 18 U.S.C. §1965 and

3    28 U.S.C. § 1391, and because (1) Defendant Taquan is found, and transacts business, in

4    this district; (2) Defendant Taquan maintains a physical presence in this district; (3)

5    Defendants, have property in this district; and (4) Defendant Hudgins resides in

6    Ketchikan, Alaska and within this district.

7                                **Personal Jurisdiction**

8       32.    Defendant Taquan, at all times material hereto, personally or through an

9    agent:

10           a.    Operated, conducted, engaged in or carried on a business venture in

11    Alaska and/or;

12           b.    Was engaged in substantial activity within this state and/or;

13           c.    Operated vessels on the waters of this state and/or;

14           d.    Purposefully availed itself of the benefits of conducting activities in

15    Alaska by purposefully directing its activities toward this state, thereby obtaining

16    the benefits and protections of this state's laws;

17           e.    The acts of Defendant Taquan set out in this Complaint occurred in

18    whole or in part in Alaska.

19       33.    Taquan was engaged in the business of providing to the public, and Plaintiff

20    in particular, for compensation, transportation aboard seaplanes it owned and/or operated.

21    Taquan was and is a for profit corporation with its headquarters, principal address, and

22    principal place of business located in Alaska.

23       34.    Defendant Hudgins worked for Taquan and resided in Alaska at all times

24    material hereto

25       35.    Defendant Taquan's Director of Operations, George Curtis, worked for

26    Taquan and resided in Anchorage. Alaska at all times material hereto.

## GENERAL ALLEGATIONS

36.     The allegations in this Complaint arise from a seaplane crash that occurred on July, 10 2018.

37.     In July of 2018 Plaintiff Jack Davis and his friends traveled to Steamboat Bay Fishing Club for a fishing vacation.

38.     Steamboat Bay Fishing Club is located on the shore of Noyes Island, Alaska.

39.     Seaplanes land on the water near Steamboat Bay and then taxi to a dock at the facility to unload and load passengers, luggage and supplies. The seaplanes remain on the water during these operations.

40.     Jack Davis, and his friends were scheduled to leave Steamboat Bay on the morning of July 10, 2018 around 6:30 a.m.

41.     That morning, when Jack Davis and his friends went down to where the seaplanes dock, the area around Steamboat Bay had fog and light rain.

42.     The Steamboat Bay manger told Jack Davis that they were keeping an eye on the weather and so was Taquan.

43.     Other guests were told the seaplanes had been delayed in arriving due to weather conditions.

44.     Jack Davis was assigned to the second group of passengers to leave by seaplane the morning of July 10, 2018.

45.     Jack Davis saw the Taquan Seaplane come through the clouds and land on the bay before taxiing across the water to the dock.

46.     Taquan Air is a 14 CFR Part 135 air carrier that held on-demand and commuter operations.

47.     Taquan Air is authorized to conduct business exclusively under the business names "Venture Capital, LLC" or "Taquan Air."

48.     Taquan Air's headquarters is located in Ketchikan, Alaska.

49.     At the time of the July 10, 2018 crash the Taquan Director of Operations resided in Anchorage, Alaska.

50.     After the Taquan Seaplane tied up to the Steamboat Bay dock, guests and luggage were unloaded.

51.     Jack Davis and the members of his group were then asked to board the Taquan Seaplane by crossing to the Taquan seaplane which was floating adjacent to the dock.

52.     Jack Davis made his way to the last seat on the pilot or left side of the Taquan Seaplane.

53.     The de Havilland Canada DHC-3T Turbo Otter is a single-engine, high-wing, propeller-driven aircraft.

54.     The Taquan Seaplane had two floats attached to its fuselage so that is could land, float and take-off from water.

55.     The Taquan Seaplane had a single pilot, Mike Hudgins, and 10 passengers, including Jack Davis, on board when it taxied away from the dock at Steamboat Bay around 7:30 a.m. on July 10, 2018.

56.     This was a VFR flight and thus based on the principles of "see and avoid" as to both other seaplanes and terrain.

57.     The weather and visibility conditions were not good and appeared to be worsening as the Taquan Seaplane was pushed away from the Steamboat Bay dock.

58.     Personnel at Steamboat Bay and Taquan in Ketchikan communicated with the pilot, Hudgins, and approved the Seaplane departing despite the known and suspected worsening weather conditions

59.     The Alaska Aviation Weather Unit (AAWU) had forecasted Marginal Visual Flight Rules (MVFR) for the area where the crash occurred. MVFR means a

8

ceiling between 1,000 and 3,000 feet above ground level ("AGL") (inclusive) and/or 3 to 5 statute miles visibility.

60.     An Airmen's Meteorological Information (AIRMET) Advisory was issued at 4:10 a.m. on July 10, 2018 for "mountains obscured in clouds/precipitation" and was active for Mount Jumbo at the time of the crash. Conditions were reported to deteriorate.

61.     An Area Forecast Discussion (AFD) was issued at 5:44 a.m. by the NWS Weather Forecast Office in Juneau which stated that a front moving across the Alaska panhandle would increase winds and rain associated wither the front would spread across the region and reduce ceilings and in some areas visibility.

62.     At 7:56 a.m. the Automated Weather Observing System (AWOS) at Hydaburg Seaplane Base eight miles west-southwest of Mount Jumbo reported a ceiling broken at 1,000 feet above ground level AGL and overcast at 2,400 feet AGL. By 8:47 the Hydaburg AWOS was reporting clouds at 900 feet AGL and a ceiling overcast at 1,700 feet AGL.

63.     Hudgins began the flight without recording a weight and balance calculation as required by the Taquan General Operations Manual (GOM).

64.     Hudgins, attempted a short safety briefing as he taxied the Seaplane away from the Steamboat Bay dock.

65.     The safety briefing consisted of Hudgins looking back over his shoulder and yelling out over the noise from the engine and pointing to the life vests, with no demonstration of their use, and then saying the only music he had on the passenger headphones was Willie Nelson.

66.     Hudgins began to increase power to the engine of the Seaplane and began the take-off sequence across Steamboat Bay.

67.     The weather and visibility conditions were not good and appeared to be worsening before the Seaplane began a take-off run across the Bay.

9

68.     The Seaplane took off from Steamboat Bay and then lifted into the air when the floats separated from the surface of the water. The time was close to 7:45 a.m.

69.     The weather and visibility conditions were not good and appeared to be worsening as Hudgins began to have the Seaplane climb above the water.

**A.     The Crash**

70.     Once airborne Hudgins flew the Seaplane flew over water and at a low altitude.

71.     The area between Noyes Island and Ketchikan consists of remote inland fjords, islands and coastal waterways.

72.     As the flight progressed visibility diminished further.

73.     Hudgins maneuvered the Seaplane in different directions as he tried to find areas of less dense fog and cloud cover.

74.     Hudgins flew into clouds, fog and rain during the flight and prior to the crash.

75.     Even though the clouds and fog became increasingly thick with very little visibility, Hudgins did not attempt to locate a place for a safe water landing.

76.     Images taken from the Hydaburg, Craig and Kassan FAA weather cameras on July 10, 2018 for times surrounding the crash period showed increasing clouds and fog with decreasing visibility.

77.     During most of the flight the Seaplane was flying at a low altitude above water.

78.     Some of the passengers on the Seaplane began asking out loud for the pilot to make a water landing rather than continue on in limited to no visibility.

79.     As Hudgins flew into more thick clouds east of Hydaburg and as he entered Sultzer Portage, he began turning the Seaplane south and increasing the altitude, but then leveled off.

80.     As the Seaplane was flying through thick clouds and fog with near zero visibility, Hudgins suddenly pushed the throttles to full power and the engine noise rose dramatically.

81.     The alarming change in the flight caused Jack Davis to look out the front window of the Seaplane where he suddenly saw a mountain looming immediately ahead.

82.     Before Jack Davis could react, there was a sudden violent and loud crash as the Seaplane hit the mountain.

83.     On impact, the Seaplane's floats were sheared off and the occupants were thrown about violently inside.

**B.     The Rescue**

84.     The Seaplane came to rest in an area known as Mount Jumbo on Prince of Wales Island sustaining substantial damage to wings and fuselage.

85.     Jack Davis was disorientated as he was bounced around from the impact and found himself hanging out of his seat dazed but with the safety belt keeping him strapped in place.

86.     Jack Davis was able to get free of the seatbelt but felt an immediate sharp pain in his back.

87.     A passenger and friend, Bob Price, came to where Jack Davis was positioned and they both tried to open the Seaplane emergency exit door but it was jammed shut.

88.     The pain in Jack Davis' back kept him from moving any more than necessary, so he stayed in the back resting as everyone else got out of the wreckage of the Seaplane.

89.     Jack Davis began to smell fuel fumes so, with immense effort, he began to crawl forward to the front of the Seaplane over blood sand debris in the aisle.

1    90.    Jack Davis finally made it to the pilot's seat and remained there unable to

2    move further due to the intense pain in his back.

3    91.    Some of the passengers were able to work together to extricate Jack Davis

4    out of the cockpit of the Seaplane and onto the adjacent slope rock face.

5    92.    Once out of the Seaplane, Jack Davis was in ever worsening back pain.

6    93.    The survivors of the Taquan Seaplane crash were on the mountain for

7    several hours. The temperature at that altitude was extremely cold, the wind was blowing

8    and there was intermittent rain

9    94.    After the crash, Hudgins told passengers, including Tom and Bette Hulbert,

10   that he thought he was going to land on water before the crash into the mountain.

11   95.    At 8:43 a.m., on July 10, 2018 the United States Coast Guard (USCG)

12   Sector Juneau received a report from the Alaska State Troopers (AST) that a seaplane had

13   crashed near Sulzer Portage on Prince of Wales Island.

14   96.    Two MH-60J Sea Hawk helicopters were launched from USCG Air Station

15   Sitka, and Alaska State Troopers (AST) activated the Ketchikan Volunteer Rescue Squad

16   (KVRS) and other rescue personnel from Ketchikan.

17   97.    At 10:47 a.m. both USCG helicopters arrived in the search area and one

18   helicopter obtained a weak direction finding (DF) bearing from the Emergency Locator

19   Transponder (ELT) at the crash scene.

20   98.    The DF bearing, and the survivor's description of the accident made by a

21   weak cell phone call, were used to direct search assets in close proximity to the accident

22   site.

23   99.    The Taquan Seaplane survivors finally heard the USCG helicopters as they

24   approached, but they could not see them due to the heavy fog and cloud cover.

25   100.    Two-way radio communications were established between the survivors and

26   USCG by utilizing the Seaplane's radio. The USCG located the accident site at 11:56 a.m.

101.     Hovering as low as 100 feet over the crash, the USGC helicopter lowered a rescue swimmer through clouds so thick the pilots couldn't see the ground.

102.     One by one the survivors of the Taquan Seaplane crash were hoisted up to the Coast Guard Helicopter.

103.     By 1:08 p.m. all 11 people from the crash of the Seaplane had been hoisted into the rescue helicopter from the crash site.

104.     All the occupants of the Seaplane were taken to a nearby staging area and then flown by helicopter to Ketchikan, Alaska.

### C.     Multiple Surgeries

105.     Once the Coast Guard and an Evac helicopter got Jack Davis to Ketchikan Alaska the emergency room had a CT scan done. Jack Davis was told he had a severe injury to his spine. The diagnostic studies showed he had a T-12 comminuted fracture.

106.     Unable to handle such a severe and complicated injury in Ketchikan, the medical team made the decision to get Jack Davis to the nearest Level I Trauma Center that had a neurosurgeon. Medical personnel packed Jack up on a medical transport jet and flew him to Harbor View Hospital in Seattle, Washington.

107.     At Harbor View Hospital more diagnostic images showed his spinal injuries were far more extensive and he was diagnosed with T11- T12 flexion distraction injury with associated T12 end plate burst fracture.

108.     Jack Davis had to undergo a posterior spinal instrumentation and fusion from T10 to L2.  This was done on July 11, 2018.

109.     This spinal fusion is a procedure where the neurosurgeon first puts the bones of the spinal vertebrae into the correct position and then straightens the spine by fusing the bones together with grafts and implants that included special rods and screws.

110.     A second surgery was needed to complete the spinal correction which was a T12 corpectomy with a cage.

13

111. This surgery required the neurosurgeon to remove the crushed vertebral body as well as the disc spaces at either end, to completely decompress the cervical canal. A metal cage was then inserted into the disc space and manipulated into position. This second operation was done on July 16, 2018.

112. Jack Davis has a severe and permanent injury that limits his mobility and causes pain and discomfort as a result of the Taquan Seaplane crash of July 10, 2018.

## LIABILITY ALLEGATIONS

### A. Pilot Hudgins

113. Hudgins executed a controlled flight into terrain (CFIT) on July 10, 2018.

114. Hudgins did not report any mechanical malfunctions with the Seaplane that would have caused or contributed to the crash.

115. Hudgins claimed that as the flight progressed toward Sulzer Portage, the altitude of the Seaplane was 1,000 feet above the sea and the visibility decreased to zero.

116. After flying into clouds with no visibility, Hudgins attempted a climbing right turn of the Seaplane.

117. Prior to completing the right turn, Hudgins saw what he believed to be a body of water and so he leveled the Seaplane wings.

118. Hudgins eventually realized that the airplane was not flying over water but an area of snow-covered rising terrain so he applied full power and initiated a steep climb but crashed into the Seaplane into a mountain.

119. The Seaplane impacted Mount Jumbo at or above 2,200 feet.

120. Prior to the crash Hudgins claims he was flying the Seaplane at 1,100 feet above Mean Sea Level (MSL). At the time, Hudgins was flying in an area with terrain as high as 4,300 feet MSL. Hudgins was operating the Seaplane at 3,200 feet MSL lower than the highest obstacles in the area.

1     121.   14 C.F.R. § 91.155 requires pilots to have at least 1 mile of visibility in all

2 directions and be separated from clouds as follows:

3         a.     At least 500 feet below clouds above the aircraft;

4         b.     At least 1,000 feet above clouds below the aircraft; and

5         c.     At least 2000 feet lateral or horizontal separation with clouds.

6     122.   14 C.F.R. §135.205 prohibits airplane operations under VFR in uncontrolled

7 airspace when the ceiling is less than 1,000 feet unless flight visibility is at least 2 miles.

8     123.   The weather and visibility conditions were below the minimum VFR

9 standards for both Part 91 and Part 135 operations by Taquan and Hudgins.

10     124.   The weather conditions near the crash site were "Instrument Only"

11 conditions, although this was not an Instrument Flight Rules (IFR) flight.

12     125.   Taquan and Hudgins were operating the Seaplane on July 10, 2018 in

13 violation of these and, as detailed below, other Federal Aviation Regulations.

14     126.   Hudgins was negligent in his decision to depart the Steamboat Bay dock on

15 July 10, 2018 with ten (10) passengers and deteriorating weather and visibility conditions.

16     127.   Hudgins was negligent in his decision to take-off from Steamboat Bay on

17 July 10, 2018 with deteriorating weather and visibility conditions.

18     128.   Hudgins was negligent in his decision to continue the flight with

19 deteriorating weather and visibility conditions and a safe water landing available to him.

20     129.   Hudgins was negligent in his decision to fly into IFR conditions.

21     130.   Hudgins was negligent in his decision to fly toward the mountainous Island

22 terrain when he tried to turn around in Sultzer Portage.

23     131.   Hudgins was negligent in his belief he was flying over water when he knew

24 or should have known his flight path was taking the Seaplane into a mountainous area.

25     132.   Hudgins had also turned off the Terrain Awareness and Warning System

26 (TAWS) on the July 10, 2018 flight.

15

133.    A terrain awareness and warning system (TAWS) is an on-board system aimed at preventing CFIT.

134.    Hudgins did not turn the Terrain Awareness and Warning System (TAWS) to the on position even when he encountered limited and then no visibility.

135.    Hudgins was negligent, reckless and grossly negligent in his decisions and actions that led to and were causes of the crash of the Seaplane on July 10, 2018.

**B.    Taquan Air**

136.    Taquan knew Hudgins and the Seaplane carrying passengers was flying into deteriorating weather conditions on a VFR flight.

137.    Taquan knew its pilot and the Seaplane were carrying passengers into deteriorating visibility and weather on a VFR flight.

138.    Taquan knew its pilot and the Seaplane would be flying into mountainous terrain in marginal weather conditions.

139.    Taquan knew the day combination requirements of 14 CFR 91.155 in class G airspace, clear of clouds and 14 CFR 135.203 that allow flights as low as 500 feet above the surface, provided a narrow safety margin at best.

140.    Taquan knew the combined allowances of these visual flight rule regulations could result in scud running and would not provide an adequate level of safety for passenger carrying operations in mountainous areas where any loss of situational awareness could result in a CFIT.

141.    Taquan knew that 14 CFR 135.205(a) increases the visibility to at least 2 miles when the ceiling is less than 1,000 feet which would not provide an adequate level of safety while operating in mountainous terrain.

142.    Taquan was fully aware of a number of safety issues that would have led any flight operation that put safety first to delay or cancel the flight.

143. Taquan risk assessment failed to identify the weather risks prior to departure from Steamboat Bay.

144. The conditions on July 10, 2018 prior to departure of the Seaplane indicated actual weather risk factors would have driven the evaluation from the caution range into the medium risk range requiring management approval before dispatch.

145. During interviews by the NTSB after the July 2018 crash with the Taquan flight coordinator, chief pilot, and Hudgins, none of them identified any weather factors as a risk to the July 10, 2018 flight that resulted in a crash.

146. Taquan and its employees knew or should have known that weather was a significant risk factor on July 10, 2018 along the route the Seaplane was going to have to travel from Steamboat Bay to Ketchikan.

147. Taquan's training does not break out risk elements with a method to evaluate each risk factor.

148. Taquan's training risk assessment totals for notification do not match the actual form in use.

149. Taquan Pilots accept what is given to them by dispatch, and accept that the weather is what they will find after they depart and they will deal with it accordingly.

150. During the initial visit to Taquan by the NTSB after the July 10, 2018 crash no company audits of this risk assessment process could be found by the management staff on hand.

151. 14 CFR 135.154(a)(b) states that the aircraft must be equipped with an approved terrain warning system.

152. The standard practice for Taquan is to have its pilots always operate seaplanes with the Terrain Awareness Warning System (TAWS) in inhibit mode.

153. Hudgins had turned off the TAWS prior to the crash of July 10, 2018 consistent with the standard practice of Taquan.

17

## C. Prior CFIT Crashes

154. Taquan knew or should have known that on July 10, 2018 Hudgins was flying into marginal visibility without the TAWS operating.

155. Prior to the July 10, 2018 Taquan crash the NTSB found another Part 135 operator's allowance of routine use of the terrain inhibit switch for inhibiting the TAWS to be a contributing cause to an accident that claimed the lives of two commercial pilots and a passenger when their plane collided with mountainous terrain near Togiak, Alaska.

156. As with that crash, Hudgins, entrusted with the lives of ten passengers, turned off the system that allows pilots to know when they may be approaching ground in order to avoid a crash, and he did so with the tacit approval of Taquan.

157. Taquan was well aware of the history of Part 135 operators encouraging their pilots to take unnecessary weather risks when flying passengers, and continued to follow that practice even with that knowledge.

158. Taquan was aware that on July 24, 2007, a de Havilland DHC-2 Seaplane, N995WA, crashed into mountainous tree-covered terrain some 40 miles northeast of Ketchikan, Alaska.

159. The Seaplane was being operated as a VFR sightseeing flight under the provisions of 14 CFR Part 135.

160. The Seaplane was operated by Venture Travel LLC, dba Taquan Air Service, of Ketchikan.

161. The Taquan pilot of the Seaplane and the four passengers were killed.

162. On July 31, 2008, the Safety Board issued four safety recommendations to the FAA regarding Southeast Alaska air tour operations. They are as follows:

    a. NTSB Recommendation Number A-08-59 -- Install and maintain weather cameras at critical areas of air tour routes within the Misty Fjords National

18

Monument and other scenic areas in Southeast Alaska that are frequently traveled by air tour operators.

   b.    NTSB Recommendation Number A-08-60 – Develop a permanent mechanism to provide en route and ground-based observations of air tour flights in Southeast Alaska at least once a month during the tour season to ensure operators are adhering to safe flying practices.

   c.    NTSB Recommendation Number A-08-61 – Develop, in cooperation with Southeast Alaska commercial air tour operators, aviation psychologists, and meteorologists, among others, a cue-based training program for commercial air tour pilots in Southeast Alaska that specifically addresses hazardous aspects of local weather phenomena and in-flight decision-making.

   163.   Taquan did not adopt or enforce any of these recommendations made by the NTSB.

   164.   Taquan was aware that Alaska based seaplane operators have experienced a series of high-profile crashes in recent years.

   165.   Taquan was aware that in 2010, a seaplane crashed into a mountain north of Dillingham, killing former U.S. Senator Ted Stevens and four of the eight other people aboard.

   166.   Taquan was aware that in 2013, all ten people aboard another seaplane died when that plane crashed on takeoff at the Soldotna airport.

   167.   Taquan was aware that on June 25, 2015, a seaplane collided with a mountain east-northeast of Ketchikan, Alaska killing the pilot and all eight passengers. Marginal visual flight rules conditions were reported in the area at the time of the accident.

   168.   Taquan was aware that the Seaplane was operated by Promech Air, Inc., of Ketchikan.

19

1    169.    Taquan was aware that on April 25, 2017, the NTSB adopted its final report

2    concerning the June 25, 2015, Promech crash. As a result of that investigation, the NTSB

3    identified the following safety issues as a result of this accident investigation:

4           a.       Need for training program improvements for Ketchikan air tour

5    operators that address pilot human factors issues such as pilot assessment of safe

6    weather conditions, pilot recognition of potentially hazardous local weather

7    patterns, and operational influences on pilot decision-making.

8           b.       Need for collaboration among Ketchikan air tour operators to identify

9    and mitigate operational hazards through analysis of automatic dependent

10   surveillance-broadcast (ADS-B) data.

11          c.       Lack of conservative weather minimums for Ketchikan air tour

12   operators.

13          d.       Lack of defined curriculum segments for CFIT-avoidance training for

14   all 14 CFR Part 135 operators.

15          e.       Nuisance alerts from the Class B terrain awareness and warning

16   system (TAWS) during tour operations.

17          f.       Limitations of older software and terrain database versions for the

18   legacy Chelton Flight Systems FlightLogic electronic flight instrument system

19   (EFIS).

20          g.       Lack of minimum training requirements for operational control

21   personnel and lack of guidance for FAA inspectors for performing oversight of

22   operational control training programs.

23          h.       Lack of a requirement for a safety management system (SMS) for

24   Part 135 operators.

25   170.    Taquan was aware that the NTSB found that the cause of the June 25, 2015

26   Seaplane crash was: (1) the pilot's decision to continue visual flight into an area of

instrument meteorological conditions, which resulted in his geographic disorientation and controlled flight into terrain; and (2) Promech's company culture, which tacitly endorsed flying in hazardous weather and failed to manage the risks associated with the competitive pressures affecting Ketchikan-area air tour operators. The Company's lack of a formal safety program and its inadequate operational control of releasing flights for departure were also cited.

171. One year after the fatal Promech crash, and during the NTSB investigation of that crash, Taquan purchased the assets of Promech Air. This buy-out allowed Taquan to expand its fleet to 16 aircraft and two maintenance facilities, changes it advertised with pride.

172. Most of Promech's personnel became Taquan employees in the acquisition.

173. Taquan stated in a press release that "We've offered everybody that was currently employed with Promech in Ketchikan an equivalent or very similar position at Taquan.

174. Hudgins had worked for Promech for three years prior to being hired by Taquan.

175. Hudgins knew about of the circumstances of the June 25, 2015 Promech Seaplane crash.

176. Taquan knew that Hudgins was aware of the circumstances of the June 25, 2015 Promech Seaplane crash.

177. One of the aircraft Taquan purchased from Promech is the same de Havilland Otter that crashed with Jack Davis and nine other passengers on board just two years later on July 10, 2018.

178. Taquan had a duty to learn from the Promech crash and adopt a safety plan and culture to prevent similar crashes from happening again based on what the NTSB revealed to them.

179. Taquan ignored the lessons to be learned from the Promech crash and chose not to adopt a safety plan and culture to prevent similar crashes from happening again as the July 10, 2018 crash happened under almost identical circumstances.

180. Taquan was fully aware of these prior crashes and the causes.

181. Taquan participated in meetings with the NTSB, FAA and other Part 135 operators after the Promech crash of 2015.

182. Taquan knew what steps to take to prevent another similar tragedy.

**D.**     **Taquan's False Promises of Safety**

183. Taquan advertised making Safety First, but did nothing to ensure that was a reality.

184. Taquan's "Safety First" slogan was just an empty promise made to unknowing passengers like Jack Davis.

185. Like other similarly identical crashes, the Taquan pilot's decision to take off and then continue flying under VFR in weather conditions warranting IFR coupled with Taquan's culture and lack of a conforming safety program, caused yet another entirely avoidable plane crash. A crash that left several people injured and Jack Davis with a broken spine.

186. The Taquan website promises "Safety first, second, and always," and claims Taquan's "safety culture is woven into everything we do." These statements are false and misleading to the general public, including Jack Davis.

187. Taquan claims it has been a "Five Star Certified Medallion Shield Carrier since 2008," which, according to Taquan, signifies it has "exceeded the FAA's safety requirements." None of these representations are true.

188. Taquan grossly misrepresents the significance of its Medallion status.

189. George Curtis, the Director of Operations (DO) for Taquan, was hired in January of 2016. In October of 2017 Mr. Curtis was hired as the chief pilot for Grant

Aviation and he moved to Anchorage for this job. Mr. Curtis was promoted to DO of Grant in April of 2018. In addition to holding two DO positons, Mr. Curtis was also a contract simulator instructor for Alaska Airlines.

190.    As the DO, Mr. Curtis was responsible for ensuring that both flight crews and operational control employees comply with the published policies and procedures with respect to both Taquan Air Ops Spec A008 and herein.

191.    As the Taquan DO, Mr. Curtis had the authority and responsibility to perform the duty of safety officer for flight operations, as well as obtain and disseminate aeronautical weather data for the control of flight operations.

192.    Mr. Curtis had not been to the Taquan facility for months prior to the crash, let alone performing the job responsibilities of a DO as called for under FAA Regulations and Taquan company policy.

193.    The Taquan Flight Coordinator had not seen or spoken to Mr. Curtis, the Taquan DO, for months prior to the July 10, 2018 crash.

194.    As the Taquan DO Mr. Curtis was responsible for training of the Flight Coordinator, but had not done so or was even aware of the qualifications for being a Taquan flight coordinator.

195.    Taquan was aware the Company's DO, Mr. Curtis, was living in Anchorage and performing his job in name only and for recordkeeping.

196.    The Taquan General Operations Manual (GOM) was inadequate or did not address flight operations as required by FAA regulations, including 14 CFR 119.69 and FAA Order 8900.1.

197.    The Taquan Flight Operations Manual, Operations Specifications, and Training Manual did not include any mention of a risk assessment process.

198. At the time of the July 10, 2018 crash Taquan had a risk assessment form which was filled out entirely by the Flight Coordinator, not the pilot or with involvement of the DO Mr. Curtis.

199. The risk assessment form was treated as an informality by Taquan pilots and a task left to the Flight Coordinator.

200. Mr. Curtis, did not provide training on the use of the risk assessment form to Taquan pilots even though he was the Company DO.

201. Taquan had a safety manual and Section 1 of the Flight Operations Manual (FOM) states: "It is the policy of this company to provide the best in air travel safety and reliability. Well trained and professional employees are key to reaching this goal. To maintain the highest level of safety, all personal must perform their duties in accordance with the procedures set forth in this manual, in compliance with Operations Specifications and the applicable FARs."

202. The Seaplane crash of July 10, 2018 was the result of the reckless disregard of Taquan company policy to provide the best in air travel safety and reliability.

203. The Seaplane crash of July 10, 2018 was the result of the reckless disregard of maintaining the highest level of safety.

204. The Seaplane crash of July 10, 2018 was the result of the reckless disregard of Taquan personal performing their duties in accordance with the procedures set forth in company policies and procedures.

205. The Seaplane crash of July 10, 2018 was also the result of the reckless disregard of and applicable Federal Aviation Regulations.

206. Pilot error, Taquan's lack safety culture and Taquan's failure to follow its stated safety policies and procedures were the causes behind the crash that nearly killed ten passengers, and severely injured several of them, including Jack Davis.

## FIRST CAUSE OF ACTION
### For Negligence, Carelessness, Wantonness, and Recklessness
### (Against Defendants Taquan, Hudgins and Does 1-5)

207.    Plaintiffs hereby incorporate by reference, as though fully set forth herein, in the preceding paragraphs, and allege as follows.

208.    At all times material, Defendants owed a duty to their passengers, including Plaintiff, to exercise reasonable care for the health, welfare, and safety of their passengers.

209.    At all times material, Defendants knew or, in the exercise of reasonable care, should have known that the flight from Steamboat Bay to Ketchikan on July 10, 2018 was being operated in a negligent and unsafe manner and was unreasonably dangerous and presented an undue risk of harm to Taquan's passengers. Said dangers and risks existed for a sufficient length of time so as to provide notice to Defendants that the weather and visibility conditions were unsafe for seaplane travel.

210.    At all times material, Defendants knew or, in the exercise of reasonable care, should have known that the dangers and risks associated with the flight from Steamboat Bay to Ketchikan on July 10, 2018 would increase the likelihood of passengers being injured.

211.    At all times material Defendants' conduct was outside the range of ordinary activity involved in seaplane transportation of passengers. Defendants' conduct was not inherent to this particular type of flight and well outside the range of ordinary and acceptable behavior for an activity represented as safe. Defendants increased the risk of harm beyond that inherent in the activity. Defendants' conduct was grossly negligent.

212.    At all times material, Defendants, by and through their agents, servants, officers, and/or employees, were negligent, careless, wanton and reckless and breached their duty of care to Plaintiffs by committing the following acts and/or omissions, including, but not limited to:

a.    Failing to provide a seaplane flight with properly trained personnel;

b.      Failing to select reasonably safe route based on known and expected weather and visibility conditions;

c.      Failing to conduct an adequate and proper weather briefing before departure from Steamboat Bay;

d.      Failing to routinely monitor and/or supervise the weather and visibility to ensure that it the seaplane flight was being operated in a safe manner;

e.      Failing to adequately monitor, supervise and audit the ongoing operations of its, employees, servants, agents, representative, and/or pilot to ensure it was using properly trained, competent personnel, and proper and safe procedures to provide a reasonably safe flight for its passengers;

f.      Failing to adopt and implement proper and adequate policies, protocols, and procedures for to ensure the safe operation of seaplane, in particular when there is inclement weather and poor visibility;

g.      Failing to adopt and implement proper and adequate policies, protocols, and procedures requiring employees and/or agents involved in operating Taquan seaplanes to abide by reasonable safety standards;

h.      Failing to provide adequate and proper information regarding the flight from Steamboat Bay to Ketchikan on July 10, 2018 to passengers, including Jack Davis, so that they could make an informed decision as to whether to board the seaplane;

i.      Assuring passengers, including Jack Davis, that all aspects and conditions of the flight from Steamboat Bay to Ketchikan on July 10, 2018 were reasonably safe and appropriate, when in fact they were not;

k.      Failing to ensure all necessary steps were taken for Jack Davis to safely be a passenger in all aspects of the flight from Steamboat Bay to Ketchikan on July 10, 2018;

l.      Lulling Taquan passengers into a false sense of security regarding the flight from Steamboat Bay to Ketchikan on July 10, 2018, the competency of its employees, servants, agents, representatives, by its advertising, marketing and representations;

m.     Failing to provide proper training to the passengers, including Jack Davis, so as to properly train and educate them what to do if there was an emergency during flight from Steamboat Bay to Ketchikan on July 10, 2018;

n.      All other negligent acts and/or omissions discovered during litigation.

213.    As a direct and proximate result of Defendants' negligence, on or about July 10, 2018, Jack Davis suffered severe and permanent injuries, pain and suffering, disability, mental anguish, inconvenience, the loss of capacity for enjoyment of life, and has incurred medical expenses in the past and will incur medical expenses in the future. All of said damages are permanent and continuing in nature.

214.    As a further and direct and proximate cause of Defendants' negligence, Mary Lou Davis, Jack Davis' wife, has suffered, is suffering, and will suffer in the future the following damages:

a.      Mental pain and suffering; and

b.      Loss of Jack Davis' love, companionship, comfort, care, assistance, protection, affection, society, and moral support.

215.    As a direct and proximate cause of the aforementioned conduct of Defendants, and each of them, Jack Davis was required to, and did, employ physicians and other medical professionals to examine, treat, care for, and rehabilitate him, and did incur medical and incidental expenses, and will require to do so in the future. The exact amount of said expenses is unknown at this time as Jack Davis is still treating.

216. Plaintiffs claim all damages according to proof at trial. Said damages are in excess of the jurisdictional limits of the Court. Plaintiffs further demand a trial by jury on all issues so triable as a matter of right.

**SECOND CAUSE OF ACTION**
**For Negligent Misrepresentation**
**(Against Defendants Taquan and Does 1-5)**

217. Plaintiffs hereby incorporate by reference, as though fully set forth herein, in the preceding paragraphs, and allege as follows.

218. At all times material, Defendants Taquan and Does 1-5 had a pecuniary interest in coordinating, marketing, promoting, advertising, vouching for, and directly selling Taquan Air to prospective passengers.

219. At all times material, Defendants Taquan and Does 1-5, owed a duty to their passengers, including Jack Davis, to exercise reasonable care in obtaining and accurately communicating any information relating to seaplane transportation to and from Steamboat Bay they developed, created, coordinated, marketed, promoted, advertised, vouched for, and directly sell to their fishing camp guests.

220. At all times material, Defendants Taquan and Does 1-5 made misrepresentations of material fact relating to the seaplane transportation provided by Taquan Air, including the claim Taquan "Safety First, Second and Always."

221. At all times material, Defendants Taquan and Does 1-5 knew or, in the exercise of reasonable care, should have known that the representations of material fact, outlined above, were untrue and misleading.

222. At all times material, Defendants Taquan and Does 1-5, by and through their agents, servants, officers, and/or employees, were negligent, careless, and breached their duty of care by committing the following negligent acts and/or omissions, including, but not limited to:

28

a.      Supplying false information relating to the safety of Taquan Air to Jack Davis in the course of their business of providing seaplane transportation to paying guests;

b.      Lulling its passengers into a false sense of security regarding the competency of its employees, servants, agents and representatives by its advertising, marketing and representations;

c.      Failing to warn Jack Davis or notify the other passengers before boarding the Taquan Seaplane on July 10, 2018 that the pilot would be navigating in an area with or expected diminishing weather conditions and increasingly limited visibility;

d.      All other negligent acts and/or omissions discovered during litigation.

223.   At all times material, Defendants Taquan and Does 1-5 made the misrepresentations of material fact, outlined above, to induce guests to purchase seaplane travel it developed, created, coordinated, marketed, and directly sold.

224.   At all times material, Jack Davis reasonably and justifiably relied upon Defendants Taquan and Does 1-5 misrepresentations of material fact outlined above.

225.   At all times material, Defendants Taquan and Does 1-5 misrepresentations of material fact relating to the July 10, 2018 seaplane transportation influenced Jack Davis to purchase said travel with Taquan.

226.   As a direct and proximate result of Defendants' negligence, on or about July 10, 2018, Jack Davis suffered severe and permanent injuries, pain and suffering, disability, mental anguish, inconvenience, the loss of capacity for enjoyment of life, and has incurred medical expenses in the past and will incur medical expenses in the future. All of said damages are permanent and continuing in nature.

227. As a further and direct and proximate cause of Defendants' negligence, MaryLou Davis, Jack Davis' wife, has suffered, is suffering, and will suffer in the future the following damages:

        a.    Mental pain and suffering; and

        b.    Loss of Jack's love, companionship, comfort, care, assistance, protection, affection, society, and moral support.

228. As a direct and proximate cause of the aforementioned conduct of Defendants, and each of them, Jack Davis was required to, and did, employ physicians and other medical professionals to examine, treat, care for, and rehabilitate his, and did incur medical and incidental expenses, and will require to do so in the future. The exact amount of said expenses is unknown at this time as he is still treating.

229. Plaintiffs claim all damages according to proof at trial. Said damages are in excess of the jurisdictional limits of the Court. Plaintiffs further demand a trial by jury on all issues so triable as a matter of right.

### THIRD CAUSE OF ACTION
**Vicarious Liability - Actual Agency**
**(Against Defendant Taquan Air and Does 1-5)**

230. Plaintiffs hereby incorporate by reference, as though fully set forth herein, in the preceding paragraphs, and allege as follows.

231. At all times material, Hudgins acted on behalf of Defendant Taquan and Does 1-5 with respect to the Seaplane flight of July 10, 2018.

232. At all times material, Taquan and Does 1-5 exercised and/or retained the right to exercise control over the day-to-day operations of its pilots, including Hudgins while providing seaplane transportation in its Taquan seaplanes.

233. At all times material, Taquan and Does 1-5 exercised and/or retained the right to exercise control over the July 10, 2018 Taquan Seaplane flight from Steamboat Bay to Ketchikan.

30

234. As a direct and proximate result of Defendants' negligence, on or about July 10, 2018, Jack Davis suffered severe and permanent injuries, pain and suffering, disability, mental anguish, inconvenience, the loss of capacity for enjoyment of life, and has incurred medical expenses in the past and will incur medical expenses in the future. All of said damages are permanent and continuing in nature.

235. As a further and direct and proximate cause of Defendants' negligence, MaryLou Davis, Jack Davis' wife, has suffered, is suffering, and will suffer in the future the following damages:

> a. Mental pain and suffering; and

> b. Loss of Jack's love, companionship, comfort, care, assistance, protection, affection, society, and moral support.

236. As a direct and proximate cause of the aforementioned conduct of Defendants, and each of them, Jack Davis was required to, and did, employ physicians and other medical professionals to examine, treat, care for, and rehabilitate her, and did incur medical and incidental expenses, and will require to do so in the future. The exact amount of said expenses is unknown at this time as he is still treating.

237. Plaintiffs claim all damages according to proof at trial. Said damages are in excess of the jurisdictional limits of the Court. Plaintiffs further demand a trial by jury on all issues so triable as a matter of right.

## FOURTH CAUSE OF ACTION
### For Negligence
### (Against Defendants Taquan Air and Does I-V)

238. Plaintiffs hereby incorporate by reference, as though fully set forth herein, in the preceding paragraphs, and allege as follows:

239. At all times material, Taquan and Does I-V owed a duty to their passengers, including Jack Davis, to provide a reasonably safe seaplane transportation.

31

240. At all times material, Taquan and Does I-V knew or, in the exercise of reasonable care, should have known of the dangers and risks associated with the flight on July 10, 2018 from Steamboat Bay to Ketchikan being piloted by its employee Hudgins.

241. At all times material, Taquan and Does I-V knew or, in the exercise of reasonable care, should have known that the dangers and risks associated with the July 10, 2018 flight would increase the likelihood of passengers being injured or killed.

242. At all times material, Taquan and Does I-V, by and through their agents, servants, officers, and/or employees, were negligent, careless, and breached their duty of care by committing one or more of the following negligent acts and/or omissions, including but not limited to:

        a.      Failing to provide safe seaplane transportation;

        b.      Failing to provide the flight with proper equipment and personnel;

        c.      Failing to select a reasonably safe route for the flight;

        d.      Failing to exercise reasonable care in the operation and performance of the its pilot, Hudgins;

        e.      Managing and operating the Seaplane flight in an unreasonably dangerous and careless manner, by employing unfit, incompetent, and unprepared employees to operate the Seaplane;

        f.      Hiring staff, who through their lack of skill, knowledge, and experience, were incapable of identifying existing and predictable hazards for the seaplane transportation between Noyes Island and Ketchikan;

        g.      Failing to provide seaplane transportation with proper equipment and personnel, specifically including, but not limited to failing to provide safe procedures when encountering worsening weather and diminishing visibility;

        h.      Failing to require its pilots to turn on TAWS when weather and visibility diminish;

i.      Failing to take appropriate and proper measures and/or precautions to ensure the flight from Steamboat Bay to Ketchikan did not go forward when the weather and visibility was worsening;

j.      Failing to properly train pilots to safely fly its seaplanes and avoid bad weather and poor visibility conditions;

k.      Discouraging employees from reporting safety concerns;

l.      Failing to provide employees adequate training and use of TAWS;

m.      Failing to provide proper training to the passengers, including Jack Davis, so as to properly train and educate them what to do if a seaplane encounters an emergency;

n.      Failing to promote, market, and sell reasonably safe seaplane transportation to its passengers;

o.      Failing to conduct an adequate and proper investigation of prior crashes by seaplanes those pilots encounter worsening weather and diminishing visibility;

p.      Failing to properly monitor and/or supervise the subject flight of July 10, 2018, both before and during the seaplane flight to Ketchikan from Steamboat Bay;

q.      Failing to provide safe, competent and experienced pilots for seaplane operations;

r.      Failing to properly and adequately train Hudgins as a seaplane pilot;

s.      Failing to adequately monitor, supervise and audit the ongoing operations of its employees, servants, agents, and/or representatives to ensure it was using safe, proper and appropriate equipment, properly trained and competent personnel, and proper and safe procedures to provide reasonably safe seaplane transportation for its  passengers;

33

1        t.      Failing to adopt and implement proper and adequate policies,

2    protocols, and procedures for the supervision of its employees, servants, agents,

3    and/or pilots, to ensure it was operating and running a reasonably safe seaplane

4    operation;

5        u.      Failing to adopt and implement proper and adequate policies,

6    protocols, and procedures for addressing the safety of the subject seaplane flight of

7    July 10, 2018;

8        v.      Failing to adopt and implement proper and adequate policies,

9    protocols, and procedures requiring its employees, servants, agents, and/or pilots

10   involved in the July 10, 2018 seaplane transportation to abide by reasonable safety

11   standards;

12

13       w.      Failing to accurately inform seaplane passengers of the dangers and

14   undue risks associated with the subject seaplane flight of July 10, 2018;

15       x.      Assuring passengers, including Plaintiff that all aspects and

16   conditions of the subject seaplane flight of July 10, 2018 were reasonably safe and

17   appropriate for them, when in fact they were not;

18       y.      Failing to implement a method of operation which was reasonably

19   and safe and which would prevent the creation of a dangerous condition, such as

20   the one in this case, and utilizing or allowing negligent methods of operation by its

21   employees, servants, agents, and/or representatives;

22       z.      Failing to promulgate and enforce appropriate safety rules for its

23   employees, servants, agents, and/or representatives;

24       aa.     All other negligent acts and/or omissions discovered during litigation.

25   243.    As a direct and proximate result of Defendants' negligence, on or about July

26   10, 2018, Jack Davis suffered severe and permanent injuries, pain and suffering,

disability, mental anguish, inconvenience, the loss of capacity for enjoyment of life, and has incurred medical expenses in the past and will incur medical expenses in the future. All of said damages are permanent and continuing in nature.

244. As a further and direct and proximate cause of Defendants' negligence, MaryLou Davis, Jack Davis' wife, has suffered, is suffering, and will suffer in the future the following damages:

    a. Mental pain and suffering; and

    b. Loss of Jack Davis' love, companionship, comfort, care, assistance, protection, affection, society, and moral support.

245. As a direct and proximate cause of the aforementioned conduct of Defendants, and each of them, Jack Davis was required to, and did, employ physicians and other medical professionals to examine, treat, care for, and rehabilitate him, and did incur medical and incidental expenses, and will require to do so in the future. The exact amount of said expenses is unknown at this time as he is still treating.

246. Plaintiffs claim all damages according to proof at trial. Said damages are in excess of the jurisdictional limits of the Court. Plaintiffs further demand a trial by jury on all issues so triable as a matter of right.

**FIFTH CAUSE OF ACTION**
**For Negligent Selection and Retention**
**(Against Defendant Taquan Air)**

247. Plaintiffs hereby incorporate by reference, as though fully set forth herein, in the preceding paragraphs and allege as follows.

248. At all times material, Taquan developed, created, hired, selected, contracted, and retained a pilot/operator to provide seaplane transportation to Steamboat Bay guests.

249. Plaintiff entrusted his health, safety, and welfare to Taquan for the seaplane transportation of July 10, 2018.

1     250.   Plaintiff justifiably relied on Taquan to provide safe seaplane transportation,

2    and to use reasonable care for the health, safety, and welfare of him.

3     251.   At all times material, Taquan owed a duty to their passengers, in particular

4    Plaintiff to use reasonable care in the development, creation, hiring, selection, and

5    retention of the employees, servants, agents and/or representatives to provide seaplane

6    transportation, in particular the seaplane flight of July 10, 2018.

7     252.   In order to comply with their responsibility to use reasonable care in the

8    hiring, selection, and retention of the employees, servants, agents and/or pilots offering

9    seaplane transportation to Steamboat Bay guests, in particular the subject seaplane flight

10   of July 10, 2018, Taquan were required to make an appropriate investigation of the pilot.

11     253.   At all times material, Taquan failed to make an appropriate investigation of

12   its pilot, including Hudgins.

13     254.   An appropriate investigation would have revealed the unsuitability of the

14   pilot of the Seaplane, Hudgins, to provide safe seaplane transportation, and in particular

15   the seaplane flight on July 10, 2018:

16         a.     Taquan knew or should have known that Hudgins was not properly

17        trained;

18         b.     Taquan knew or should have known that Hudgins, was not properly

19        trained in ascertaining adequate safety precautions for seaplane transportation in

20        deteriorating weather and decreasing visibility conditions, as on the date of the

21        subject incident;

22         c.     Taquan knew or should have known that Hudgins, was not

23        conducting proper pre-departure weather briefings, prior to launching from the

24        dock at Steamboat Bay on July 10, 2018;

25         d.     Taquan knew or should have known that Hudgins, did not have

26        sufficient skills, knowledge and experience to identifying existing and predictable

hazards presented by the weather and visibility conditions he confronted on July 10, 2108;

e. Taquan knew or should have known that Hudgins did not provide proper training to explain to and educate passengers on what to do in the event an emergency;

f. Taquan knew or should have known that Hudgins did not warn passengers, including Jack Davis, that he would be navigating in an area with deteriorating weather conditions and decreasing visibility;

g. Taquan knew or, in the exercise of reasonable care, should have known that its employees, servants, agents, representative, and/or pilot Hudgins involved in the July 10, 2018 seaplane transportation were unfit to operate the flight in a reasonably safe manner.

255. At all times material, Taquan knew or, in the exercise of reasonable care, should have known that its pilots, employees, servants, agents, and/or representative, presented foreseeable risks to seaplane passengers.

256. At all times material, Taquan knew or, in the exercise of reasonable care, should have known that improper and negligent operation would increase the likelihood of passengers being seriously injured or killed.

257. As such, it was unreasonable to hire, select, and retain Hudgins as the operator/pilot of its Seaplane, to provide seaplane transportation to its passengers, in particular the seaplane flight of July 10, 2018.

258. Defendant Taquan by and through their employees, servants, agents and/or representatives, were negligent and breached their duty of care by selecting and not properly training Hudgins.

259. As a direct and proximate result of Defendants' negligence, on or about July 10, 2018, Jack Davis suffered severe and permanent injuries, pain and suffering,

1   disability, mental anguish, inconvenience, the loss of capacity for enjoyment of life, and

2   has incurred medical expenses in the past and will incur medical expenses in the future.

3   All of said damages are permanent and continuing in nature.

4   260.   As a further and direct and proximate cause of Defendants' negligence,

5   MaryLou Davis, Jack Davis' wife, has suffered, is suffering, and will suffer in the future

6   the following damages:

7           a.      Mental pain and suffering; and

8           b.      Loss of Jack Davis' love, companionship, comfort, care, assistance,

9           protection, affection, society, and moral support;

10  261.   As a direct and proximate cause of the aforementioned conduct of

11  Defendants, and each of them, Jack Davis was required to, and did, employ physicians

12  and other medical professionals to examine, treat, care for, and rehabilitate her, and did

13  incur medical and incidental expenses, and will require to do so in the future.  The exact

14  amount of said expenses is unknown at this time as he is still treating.

15  262.   Plaintiffs claim all damages according to proof at trial. Said damages are in

16  excess of the jurisdictional limits of the Court. Plaintiffs further demand a trial by jury on

17  all issues so triable as a matter of right.

18                          **PRAYER FOR RELIEF**

19          WHEREFORE, Plaintiffs pray for a judgment against Defendants as

20  follows:

21  1.      General damages in an amount that will conform to proof at time of trial;

22  2.      Special damages, including damages for past and future medical expenses in

23  amounts that will conform to proof at time of trial;

24  3.      Negligent infliction of emotional distress and loss of consortium damages;

25  4.      Costs and attorney fees as provided by law;

26  5.      For prejudgment and post-judgment interest as provided by law;

38

6. For punitive/exemplary damages against Hudgins and Taquan Air; and

7. For such other relief as this court deems just and appropriate.

RESPECTFULLY SUBMITTED this **30**th day of _March_ , 2020.

LAW OFFICE OF WILLIAM G. ROYCE

By: _____

William G. Royce
310 K Street, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 495-1000
Attorneys for Plaintiffs John E. Davis
and MaryLou Davis

7378751v3/28942-0001